# UNITED STATES DISTRICT COURT

for the

Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT

**9/20/21**

CENTRAL DISTRICT OF CALIFORNIA
BY: eb DEPUTY

| | |
|---|---|
| In the Matter of the Search of ) | |
| coordinates 34.5605325, -117.9127940, Littlerock, California 93543 ("SUBJECT PREMISES 3") ) ) ) ) ) ) | Case No.    2:21-mj-04337 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy & Attempt to Manufacture, Distribute and PWID a Controlled Substance |
| 21 U.S.C. 856 | Maintaining a Drug Involved Premises |
| 18 U.S.C. 922(a)(1)(A) | Dealing in Firearms without a License |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Albert Smith, Special Agent, Drug Enforcement Administration
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   9/20/21

*Judge's signature*

City and state: Los Angeles, CA

Margo A. Rocconi, United States Magistrate Judge
*Printed name and title*

AUSA: Shawn J. Nelson (Ext. 5339)

**Attachment A-3**

The premises to be searched is located at coordinates 34.5605325, -117.9127940, Littlerock, California 93543 ("SUBJECT PREMISES 3").

SUBJECT PREMISES 3, as depicted in the photograph below, is a rural plot of land bounded by chain link fencing that includes three RV's, one single-wide trailer, and one small shack like structure.  SUBJECT PREMISES 3 is found at GPS coordinates 34.5605325, -117.9127940.



iv

ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

46.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy and attempt to manufacture, possess with intent to distribute and to distribute controlled substances), 21 U.S.C. § 856 (maintaining a drug involved premises); and 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a license) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Firearms and ammunition;

d.   Any vehicle with a hidden compartment;

e.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

f.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records,

documents, or information (including electronic mail, messages
over applications and social media, and photographs) pertaining
to, obtaining, possessing, using, applications for, or
transferring money over $1,000, such as bank account records,
cryptocurrency records and accounts;

g.    Documents and records reflecting the identity of,
contact information for, communications with, or times, dates or
locations of meetings with co-conspirators, sources of supply of
controlled substances or firearms, or drug or firearms
customers, including calendars, address books, telephone or
other contact lists, pay/owe records, distribution or customer
lists, correspondence, receipts, records, and documents noting
price, quantities, and/or times when drugs, guns, or ammunition,
were bought, sold, or otherwise distributed, whether contained
in hard copy correspondence, notes, emails, text messages,
photographs, videos (including items stored on digital devices),
or otherwise;

h.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

i.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written

x

communications sent to or received from any of the digital devices and which relate to the above-named violations;

j.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

k.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

l.   Contents of any calendar or date book;

m.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

   ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   iii. evidence of the attachment of other devices;

   iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   v. evidence of the times the device was used;

   vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

   vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   viii. records of or information about Internet Protocol addresses used by the device;

   ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

47.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

48.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

49.  In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending),

including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    50.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

      b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

      c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

51.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

52.  During the execution of this search warrant, law enforcement is permitted to: (1) depress HERNANDEZ's or NAVARRO LOPEZ's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of [TARGET]'s face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

53.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Albert Smith, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against MIGUEL CRUZ HERNANDEZ, aka "Choco" ("HERNANDEZ") and JUAN VALENTIN NAVARRO LOPEZ, aka "Jay" ("NAVARRO LOPEZ") for a violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii), Conspiracy to Distribute at least Fifty Grams of Methamphetamine.

2.    This affidavit is also made in support of applications for warrants to search the following premises, vehicles, and persons:

a.    13141 Beaver Street, Sylmar, California 91342, SUBJECT PREMISES 1 more fully described in Attachment A-1;

b.    11353 East Avenue U, Little Rock, California 93543, SUBJECT PREMISES 2 more fully described in attachment A-2;

c.    Coordinates 34.5605325, -117.9127940, Little Rock, CA. 93543, SUBJECT PREMISES 3 more fully described in Attachment A-3,

d.    15421 Plummer Street, North Hills, California, 91343, SUBJECT PREMISES 4, more fully described in Attachment A-4

e.    The person of MIGUEL CRUZ HERNANDEZ, SUBJECT PERSON 1 more fully described in Attachment A-5; and

f.   The person of JUAN VALENTIN NAVARRO LOPEZ, SUBJECT PERSON 2 more fully described in Attachment A-6, collectively ("THE SUBJECT PREMISES").

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy and attempt to manufacture, possess with intent to distribute and to distribute controlled substances), 21 U.S.C. § 856 (maintaining a drug involved premises); and 18 U.S.C. § 922(a)(1)(A) (engaging in the business of dealing in firearms without a license), (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1 through A-6 and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since January 2016.  I am currently assigned to the Los Angeles Field Division

Southwest Border 4 ("SWB4").  SWB4 is a task force comprised of agents and officers from federal, state, and local agencies, assigned to investigate large-scale narcotics trafficking.

6.   I have attended DEA Basic Agent Training at the DEA Academy and received hundreds of hours of training on topics such as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques.  I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics and controlled substances, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses.  In conducting these investigations, I have used a variety of investigative techniques and resources, including but not limited to surveillance, confidential source debriefings, telephone toll analysis, and wire communications analysis in Title III wiretap investigations.

7.   I am familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics.  I am familiar with methods employed by large-scale narcotics organizations, and the sophisticated tactics that they routinely use in attempts to thwart the investigation of their narcotics organizations, including the utilization of cellular telephone (and smartphone) technology, counter surveillance techniques, debit calling cards, public

telephones, hidden vehicle compartments, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations.

8.   Prior to being employed by the DEA, I was employed as a Customs and Border Protection Officer with Customs and Border Protection, Department of Homeland Security, in Hidalgo, Texas, from November 2013 through August 2015. During my employment with Customs and Border Protection, I was tasked with, among other duties, the detection of narcotics and have become familiar with many concealment methods for narcotics in passenger and commercial vehicles.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.   DEA had previously investigated HERNANDEZ as part of an organization that recruited couriers, including from among inmates at the Los Angeles County jail, to smuggle drugs from Mexico to the Los Angeles area.  More recently DEA reviewed videos that show HERNANDEZ operating a methamphetamine conversion laboratory, which agents determined to be located at SUBJECT PREMISES 3.  During surveillance related to this investigation, agents also established that SUBJECT PREMISES 1 and SUBJECT PREMISES 2 are also involved in HERNDANDEZ's methamphetamine conversion efforts and that HERNANDEZ lives at SUBJECT PREMISES 1.

10.  Also, ATF had been investigating NAVARRO-LOPEZ as a methamphetamine dealer and learned that HERNANDEZ was NAVARRO-LOPEZ'S source of methamphetamine and that NAVARRO LOPEZ visited

SUBJECT PREMISES 1 in connection with his sales of methamphetamine.

## IV. **STATEMENT OF PROBABLE CAUSE**

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in and knowledge of the investigation, I am aware of the following:

**A.  Initial Investigation of a Drug Transportation Cell that Included HERNANDEZ as a Los Angeles-based Recipient of Loads of Drugs from Mexico.**

12.  In August 2016, DEA Los Angeles began an investigation into HERNANDEZ and others related to their importation of methamphetamine from Mexico the Los Angeles area.

13.  A confidential source ("CS-1") in the Los Angeles County Jail, stated that another inmate had attempted to recruit him/her to smuggle drugs from Mexico into the United States in exchange for money and a car registered in his/her name.[1]

14.  Agents reviewed recorded calls on the Los Angeles County jail Inmate Telephone Monitoring System ("ITMS").  Based on a review of these recorded jail calls, as well as discussions with other confidential sources, proffers with arrested defendants, and a review of law enforcement databases, agents

---

[1]  CS-1 has provided reliable and credible information that has been independently corroborated by law enforcement.  CS-1 has not been compensated regarding any of the information that he/she has provided to law enforcement.  CS-1 voluntarily provided information to law enforcement regarding the HERNANDEZ DTO because CS-1 was approached and recruited by DTO members and fearful of retaliation for declining to then act as a courier.  CS-1 has a lengthy criminal history, including several narcotics related offenses and a misdemeanor conviction for False Personation.

identified a drug trafficking organization led by Cristian SEGURA-LOPEZ, Teresa ESPINOSA, Jovan SEGURA, and HERNANDEZ, wherein couriers would be recruited from various sources, including from among inmates in the Los Angeles County Jail, to drive cars with hidden compartments to Mexico to pick up loads of drugs and drive those loads of drugs to the Los Angeles area.

15.  Agents also spoke to a second confidential source ("CS-2")[2] who explained that SEGURA would call SEGURA-LOPEZ to request drugs after which couriers would be sent to Mexico to transport drugs back to the United States, frequently in the gas tanks of vehicles.  CS-2 identified HERNANDEZ as the individual in Los Angeles who retrieved the drugs from the couriers on behalf of the DTO.  CS-2 also identified ESPINOSA as the financial leader of the SEGURA DTO.

**B.   Investigation of HERNANDEZ'S Methamphetamine Conversion at SUBJECT PREMISES 2 and SUBJECT PREMISES 3**

1.   <u>A source of information gives DEA videos of HERNANDEZ in a methamphetamine conversion laboratory</u>

16.  In May of 2021, a source of information ("SOI") contacted DEA Special Agent Jason Gertler with information on HERNANDEZ and his drug trafficking activities.  The SOI stated that HERNANDEZ operates methamphetamine conversion laboratories in the "Palmdale, Lancaster, Lake Los Angeles area."  The SOI

---

[2] CS-2 is currently incarcerated on federal narcotics charges but otherwise has no criminal convictions.  At the time CS-2 provided the information described herein, he was hoping for sentencing consideration related to that case.  Thus far, CS-2 has provided reliable and credible information that has been independently corroborated by law enforcement.

sent a series of photographs and videos depicting HERNANDEZ in a methamphetamine conversion lab. The SOI sent five videos depicting HERNANDEZ and unidentified males processing suspected liquid methamphetamine and converting it into crystalline form. The videos show HERNANDEZ holding multiple plastic "Hefty" zip lock bags which are in a large clear plastic container. The videos also show HERNANDEZ panning the camera to show a structure containing multiple boiling pots, the burners for which are connected to a propane gas tank. The videos appear to have been taken in a type of recreational vehicle, with an attached wooden structure. Investigators believe that these pots are used to boil off chemicals in converting the suspected liquid methamphetamine into crystalline form.

2. Identification of SUBJECT PREMISES 2

17. In June-July 2021, Southwest Border Group 4 and the Rialto Police Department Narcotics Unit ("RPD"), conducted surveillance at HERNANDEZ's residence at 13141 Beaver Street, Sylmar, California 91342, that is, SUJBECT PREMISES 1. In addition to surveillance, on June 16, 2021, investigators had a pole camera installed to view the incoming and outgoing vehicle traffic on the street in front of SUBJECT PREMISES 1.[3] On July 16, 2021, investigators also received authorization from this court for GPS monitoring of HERNANDEZ's two cellphones.

18. I have reviewed the pole camera footage for July 26, 2021, and it depicts the following:

---

[3] The pole camera was placed down the street in a way that it covers the area in front of SUBJECT PREMISES 1 but does not cover the residence on SUBJECT PREMISES 1.

a.   At approximately 5:43 pm (all times listed in this affidavit are approximate) a large grey and black recreational vehicle with a large decal reading "Cyclone" in white writing and bearing a red and black colored cyclone image on the rear (the "Cyclone RV") arrived being towed by a grey 2013 Dodge Ram pickup truck bearing California license plates 04915U1 (the "grey Dodge truck").[4]

b.   Three Hispanic males exited the grey Dodge truck. One was a heavier set Hispanic male wearing a white tank top ("UM1"), one was a slimmer Hispanic male wearing a dark colored polo shirt with dark jeans ("UM2"), and the third was HERNANDEZ, who was wearing a white colored basketball jersey with dark colored jeans.

c.   UM2 and HERNANDEZ walked toward HERNANDEZ's residence on SUBJECT PREMISES 1.  UM1 detached the Cyclone RV from the grey Dodge truck and walked towards HERNANDEZ's residence on SUBJECT PREMISES 1.

19.  On July 27, 2021, investigators from SWB-4 conducted physical surveillance at and monitored the pole camera at SUBJECT PREMISES 1.  Based on my participation in this surveillance, review of reports, and conversations with involved agents, I learned the following:

a.   The Cyclone RV was still in front of SUBJECT PREMISES 1.

---

[4] A vehicle registration inquiry showed the grey Dodge truck was registered to Lopez Ezequiel Orozco, or Orozco Steve Albert, 13903 Daventry Street, Pacoima, California 91331.

   b.   At 1:54 pm, a white Dodge Ram truck bearing paper California license plates (the "white Dodge truck") arrived and parked in front of the Cyclone RV.

   c.   A Hispanic male wearing a red baseball cap, green shirt, and shorts ("UM3") got out of the white Dodge truck and walked toward the pedestrian gate of SUBJECT PREMISES 1.   UM3 later exited the pedestrian gate with a weighted backpack and got back in the white Dodge truck.   The white Dodge truck left briefly and came back.

   d.   At 3:13 pm, HERNANDEZ opened the front left hatch of the Cyclone RV and placed a propane tank inside.   Then, UM3 and HERNANDEZ manipulated something out of view inside of the side hatch.   They then walked between the residence at SUBJECT PREMISES 1 and the Cyclone RV multiple times.[5]   After a period of inactivity, investigators terminated the physical surveillance but kept monitoring the pole camera.

   e.   At 5:07 pm, investigators saw a Hispanic male with a slim build wearing a black shirt, dark pants, dark baseball cap ("UM4") leave the residence at SUBJECT PREMISES 1 carrying a black plastic container and a clear plastic container.   UM4 put the containers in the trunk of a silver Acura sedan and left the location.   At 5:34 pm, the silver Acura returned and HERNANDEZ retrieved the clear plastic container from the Acura.   This container appeared to be weighted and

---

   [5] Based on the angle of the pole camera, agents could not see if HERNANDEZ and UM3 were bringing items from the house but could see that they were bringing items from the white Dodge truck to the Cyclone RV.

contain a light-brown-colored liquid.  UM4 was then observed carrying the black plastic container in his right hand, which appeared to be weighted as well.  UM4 and HERNANDEZ carried these containers towards the Cyclone RV and then were out of view behind the Cyclone RV. Investigators believe these containers were loaded into the Cyclone RV.

20.  Later investigators compared the pole camera images and the GPS data from one of HERNANDEZ'S phones and discovered the following:

a.  HERNANDEZ left SUBJECT PREMISES 1 at 1:35 pm on July 26, 2021, in the grey Dodge truck, and without the Cyclone trailer, with two other unidentified Hispanic males.  The GPS ping data showed HERNANDEZ was at SUBJECT PREMISES 1 until this time and then left and went northbound on State Route 14 towards Lancaster.  At 2:36 pm, the ping data showed HERNANDEZ was in the vicinity of East Avenue T and Longview Road in Littlerock, California.  SUBJECT PREMISES 2 and 3 are in this area.  The ping uncertainty was 11,553 meters in this area and HERNANDEZ was in this vicinity from 2:36 pm through 4:06 pm. Investigators, using the pole camera, were able to see HERNANDEZ and the two other unidentified Hispanic males arrive back at SUBJECT PREMISES 1 at 5:43 pm in the grey Dodge truck with the Cyclone RV.  The GPS data shows HERNANDEZ arriving at SUBJECT PREMISES 1 at about the same time.

b.  On July 28, 2021, at 7:42 am, the grey Dodge truck arrived at HERNANDEZ's residence and towed away the Cyclone RV.

21.  Investigators then conducted a public-records search on the registered owner of the grey Dodge truck and learned that 715 Aileron Avenue, La Puente, California 91744 was linked to the grey Dodge truck.  Investigators then conducted law enforcement inquiries on the residents of this address and found a Juan Gutierrez, who also had an address listed for him at 11353 East Ave U, Littlerock, California 93543, that is, SUBJECT PREMISES 2.

22.  On August 4, 2021, Special Agents ("SAs") Jason Gertler and Albert Smith conducted an address check at SUBJECT PREMISES 2 and saw that the Cyclone RV was there.  SAs Gertler and Smith saw that a white panel van was parked with the front end blocking the main entrance to the property, as if to prevent anyone from entering.

23.  On August 6, 2021, DEA Airwing conducted a flyover of SUBJECT PREMISES 2 and took a number of photographs.  From a review of the photographs, I learned that SUBJECT PREMISES 2 includes a large house facing south and a barn to the northwest, to which the Cyclone RV is adjacent.  DEA SA James Breason, who is clandestine lab certified, was the observer for the flyover. SA Breason advised me that the small barn located on SUBJECT PREMISES 2 had six air conditioning units affixed to the west side of the structure.  He also advised that the unusual number of air conditioning units is indicative of a methamphetamine conversion lab.  SA Breason stated that conversion labs need a lot of air flow inside of these structures because of the

chemicals being emitted, and also because it aids in the drying out process of the crystalline methamphetamine.



Figure 1 – The parcel to the top right of this photo is SUBJECT PREMISES 2



Figure 2 This image is a close up photo of a portion of SUBJECT PREMISES 2 showing the barn with six AC units affixed to side and the Cyclone RV.

24.  Based on my training, experience, knowledge of this investigation, and conversation with a clandestine lab certified investigator, I believe that SUBJECT PREMISES 2 is a methamphetamine conversion laboratory.  Per the SOI information, HERNANDEZ uses RVs to aid in converting liquid methamphetamine into crystalline form.  The Cyclone RV being located at his residence, along with the loading of a propane tank (which is used to boil off chemicals in the converting process), the loading of plastic containers full of what investigators believe to be gasoline (which is also used in the converting process), and the barn with an excessive number of air-conditioning units leads investigators to believe that this location is being used to convert liquid methamphetamine into crystalline form. Additionally, HERNANDEZ being a passenger in the grey Dodge truck used to transport the Cyclone RV, being in the same vicinity of SUBJECT PREMISES 2, per the GPS ping data, and arriving back at his residence with the RV further shows the high probability that the Cyclone RV is being used to facilitate his methamphetamine conversion lab activities.  Lastly, the white panel van being used to block/obstruct the entrance into this property, along with the tall fences to the front, indicate that the occupants of this property do not want any rival drug traffickers or law enforcement to see or gain entry into this property.

   3.  Identification of SUBJECT PREMISES 3

25.  On July 28, 2021, this court authorized the installation and use of a GPS tracking device on HERNANDEZ's

black BMW Sport Utility Vehicle ("SUV") bearing California license plate number 8MVG340 and vehicle identification number 5YMKW8C56G0R43265 (the "HERNANDEZ BMW"). On August 3, 2021, investigators assigned to SWB-4 installed the tracking device on the HERNANDEZ BMW.

26.    Over the course of the GPS monitoring of the HERNANDEZ BMW, investigators observed that it pinged at GPS coordinates 34.5605325, -117.9127940 in Littlerock, California 93543 on four separate occasions.[6]  The first occasion was on August 6, 2021 from 12:15 am to 12:23 am.  The first ping at 12:14 am had a radius of 11,553 meters, and the second ping at 12:29 am with a ping radius of 1,164 meters.  The second occasion was on August 22, 2021, from 10:50 am to 11:04 am. The third occasion was on August 25, 2021, from 10:13 am to 4:52 pm.  The fourth time was on August 27, 2021, from 6:24 pm to 6:40 pm.

27.    On August 13, 2021, DEA Airwing conducted a flyover of SUBJECT PREMISES 3 and took a number of photos.

a.    From a review of the photos, I saw that there are five structures on this property.  One structure is a white RV with a brown/orange stripe on the sides with a wooden structure attached on the northeast side.  Other structures include a single wide trailer with three large white containers to the northwest containing an unknown liquid; one small white RV to the north side; one small white RV to the west side; and one

--------

[6] GPS ping data from HERNANDEZ's cellphones is less accurate than but consistent with this GPS data from the vehicle tracker. I later researched these coordinates and learned that they correspond to the address of SUBJECT PREMISES 3.

small white structure to the south side of this property.  This property sits on a dirt road that is very isolated from other residential or commercial buildings.

       b.    I analyzed the photographs taken during the flyover of SUBJECT PREMISES 3 and the videos provided by the SOI that showed HERNANDEZ inside of an RV that was a methamphetamine conversion laboratory.  I compared the photos of the RV to the northeast that has a brown/orange stripe on the sides and the wooden structure affixed to the side of the RV to the videos.  I saw that the structures are very similar.  For example, one video supplied by the SOI shows HERNANDEZ inside a wooden structure with a freezer on the dirt floor, and when he pans the camera to the right I observed a brown/orange stripe on the side of an RV and daylight coming from under the back-right wheel. As HERNANDEZ continues to pan the camera, I observed a table where an unknown woman is packaging what appears to be crystal methamphetamine into clear plastic bags. Then the camera pans just above the table to show one small window and then one larger one to the right.  From the Airwing photos of SUBJECT PREMISES 3, I observed one small window followed by one larger window on the RV, with the exact orientation as depicted in the video.



Figure 3 – This image depicts SUBJECT PREMISES [3], with the wooden structure and RV containing the methamphetamine conversion lab in the lower left corner.

28.    Based upon my knowledge, training, and experience, I believe that this RV is the same structure as shown in the videos provided by the SOI.  The size of the RV, wooden structure attached to the right side of the RV, and the orientation of the windows share a striking resemblance to the Airwing photos.  The isolation of this property and difficulty in accessing it shows that HERNANDEZ is trying to thwart detection by law enforcement or rival drug traffickers.  All of these factors combined shows that it is highly likely that this property is being used as a methamphetamine conversion lab.

C.   **Undercover Purchases of Methamphetamine from NAVARRO LOPEZ that was Provided by HERNANDEZ**

1.   Purchase of One Pound of METHAMPHETAMINE from NAVARRO-LOPEZ on June 30, 2021

29.   Based on my conversations with ATF SA Agent Timothy Holden and DEA SA Michael Johnson, and my review of reports related to the incident, I know the following:

a.   On or about June 26, 2021, UC1 spoke to another target who has become a cooperating defendant (the "CD") and via text messages.  During the conversation, the following occurred:

i.   UC1 said that he/she had reached out to NAVARRO LOPEZ and that his/her people need a new "plug" (source of drugs).

ii.  CD asked UC1 when he/she wanted "it" (Methamphetamine, the substance that UC1 and CD had previously discussed).

iii. UC1 stated that he/she wanted to keep the deals between UC1 and CD and deals between UC2 and NAVARRO LOPEZ separate since CD has failed to come through the last three times.

iv.  CD replied that he had provided "his boy's" (NAVARRO LOPEZ'S) "number."

v.   CD said that he would call "Jay" (NAVARRO LOPEZ).

b.   On June 28, 2021, NAVARRO LOPEZ and UC1 communicated via text messages and calls.  During those communications, the following occurred:

18

i.    UC1 reminded NAVARRO LOPEZ that he/she was a contact of CD.  NAVARRO LOPEZ stated that he was in Sacramento and would be returning to the valley in about two hours.

ii.   NAVARRO LOPEZ asked UC1 if he/she wanted a sample.  UC1 stated that he/she would be sending someone to pick up a sample and NAVARRO LOPEZ agreed.

iii. UC1 stated he/she would connect NAVARRO LOPEZ and the individual picking up the sample but that he/she wanted to be sure that NAVARRO LOPEZ would be ready.  NAVARRO LOPEZ stated that the only days that he is unavailable are Saturdays and Sundays because he spends those days with the family.

iv.   UC1 asked NAVARRO LOPEZ where the individual picking up the sample should meet NAVARRO LOPEZ. NAVARRO LOPEZ said they should meet off of Sepulveda in North Hills.

v.    UC1 asked NAVARRO LOPEZ how much the sample would cost.  NAVARRO LOPEZ replied that it would cost $1,200.00 for one pound of methamphetamine.  NAVARRO LOPEZ also said that cocaine was "95" (here I believe NAVARRO LOPEZ is referring to the purity level of cocaine and not actually the cost of cocaine). UC1 stated that he/she would ask if they would be interested in cocaine.

vi.  UC1 stated that his/her contact would be purchasing volume and the price would not work for them. NAVARRO LOPEZ stated that as more drugs are purchased, the price will be negotiable

vii. NAVARRO LOPEZ asked UC1 to send him a message when he/she would be sending his/her contact and how much is wanted so that he can everything ready.  UC1 stated to give him/her approximately two days and he/she would be in contact with NAVARRO LOPEZ.

c.   Over the next days, UC1 continued to communicate with the CD and introduced UC2 to NAVARRO LOPEZ.

d.   On or about June 30, 2021, ATF SAs, DEA SAs, and VCAT[7] officers observed UC2 conduct a controlled purchase of one pound of methamphetamine from NAVARRO LOPEZ at the intersection of Plummer Street and Sepulveda Boulevard in North Hills.[8]  Based on my conversations with DEA SA Michael Johnson and ATF SA Timothy Holden I learned the following about the transaction:

i.    On June 30, 2021, UC2 and NAVARRO LOPEZ agreed via text messages and phone calls to meet in the area of a Carl's Jr. restaurant and an auto collision repair shop, that is SUBJECT PREMISES 4, near the northwest corner of Plummer Street and Sepulveda Blvd. in North Hills.  NAVARRO LOPEZ also agreed that the price for the pound of methamphetamine would be $1,200.00.

ii.   At approximately 6:00 pm, UC2 met with DEA SAs, ATF SAs, and VCAT officers at a pre-determined staging

---

[7] The Ventura County Combined Agency Narcotic Task Force.

[8] This intersection includes a Carls Jr. restaurant on the northwest corner.  An auto repair business is adjacent to the Carls Jr. to the west.  Per NAVARRO LOPEZ's statements, he works at the auto repair business, that is, SUBJECT PREMISES 4.

location. UC2 was equipped with an audio/video recording device. UC2 was given $2,500.00 in ATF agent cashier funds.

   iii. At approximately 6:30 pm, surveillance was established in the area of the meeting location.

   iv.  At approximately 6:45 pm, UC2, followed by ATF SA Timothy Holden and ATF SA Nicole Lozano, departed the staging location, and arrived at the meeting location.  UC2 parked his/her vehicle in the parking lot along the northernmost wall of the Carl's Jr.

   v.   At approximately 6:55 pm, NAVARRO LOPEZ appeared on foot and approached UC2's vehicle.  NAVARRO LOPEZ was wearing a black shirt, black hat, and shorts. NAVARRO LOPEZ had a brief conversation with UC2 through the driver's side window before getting into the front passenger seat of UC2'S vehicle.

   vi.  At approximately 7:00 pm, NAVARRO LOPEZ exited the front passenger seat of UC2's vehicle and walked west and into the parking lot of the auto repair business, that is, SUBJECT PREMISES 4.

   vii. After the transaction, the UC returned to the staging location and turned over a clear plastic Ziploc style bag containing a white crystalline substance.

   viii.   UC2 stated that he parked his car along the north wall of the Carls Jr.  He saw NAVARRO LOPEZ walk across the parking lot to his car.  NAVARRO LOPEZ confirmed who UC2 was and got in the passenger side of UC2's car.  NAVARRO LOPEZ handed UC2 a package containing methamphetamine and UC2

gave NAVARRO LOPEZ the $1,200.  NAVARRO LOPEZ got out of UC2's
car and walked back across the parking lot.

        ix.  On July 14, 2021, the DEA Southwest Lab
determined that the methamphetamine weighed 446 grams
(approximately .98 pounds)[9] and was 88% pure, yielding 392 grams
of actual methamphetamine.

        2.    Purchase of Three Pounds of Methamphetamine from
            NAVARRO LOPEZ on July, 14, 2021

30.  On July 14, 2021, UC2 purchased three pounds of
methamphetamine from NAVARRO LOPEZ for $3,600.  Based on my
review of reports related to the transaction and my
conversations with personnel involved in the transaction, I
learned the following:

        a.  On or about July 13, 2021, NAVARRO LOPEZ and the
UC spoke via phone calls.  During these calls, the following
occurred:

        i.  UC1 stated that his/her buddy (UC2) was
trying to get a hold of NAVARRO LOPEZ and NAVARRO LOPEZ didn't
answer UC2's calls.  NAVARRO LOPEZ stated that he sent UC2 his
other number.  NAVARRO LOPEZ stated that he paints cars and when
he is in the spray booth he does not answer calls.  NAVARRO
LOPEZ said to tell UC2 to call him.

        b.  On July 14, 2021, UC2 and NAVARRO LOPEZ spoke via
text messages and phone calls and arranged to meet in the
parking lot of the Carl's Jr. restaurant at the corner of
Plummer Street and Sepulveda Blvd. in North Hills and NAVARRO

---

     [9] Methamphetamine is trafficked in pounds but addressed in
Title 21 in grams.

LOPEZ agreed that the price for the three pounds of
methamphetamine would be $3,600.00.

c.   At approximately 6:15 pm, UC2 met with ATF SAs
and DEA SA Michael Johnson at a predetermined staging location.
UC2 was equipped with an audio/video recording device. UC2 was
given $3,600 in DEA funds by SA Michael Johnson.

d.   At approximately 6:53 pm, UC2 departed the
staging location and at about 7:03 pm he arrived at the Carl's
Jr.  UC2 parked his/her vehicle in the south/west corner of the
parking lot and remained in the driver's sea.  At about 7:05 pm,
UC2 called NAVARRO LOPEZ and said he had arrived at the meet
location.  NAVARRO LOPEZ told UC2 that he was dealing with a
client and would arrive to meet UC2 in approximately 5 minutes.
At approximately 7:16 pm, UC2 observed NAVARRO LOPEZ (dressed in
a black t-shirt with a red Washington Nationals baseball cap)
arrive on the passenger's side of the UC vehicle with a black
nylon bag strapped over his neck.  NAVARRO LOPEZ then entered
the UC vehicle and sat in the front passenger seat and greeted
UC2.

e.   UC2 asked NAVARRO LOPEZ what type of work he does
at the auto-body shop, that is, SUBJECT PREMISES 4, and NAVARRO
LOPEZ replied he was a painter. NAVARRO LOPEZ removed the black
nylon bag from around his neck and opened the bag. NAVARRO LOPEZ
then removed two clear plastic zip-lock bags that appeared to
contain suspected methamphetamine and handed them to UC2.
NAVARRO LOPEZ stated the suspected methamphetamine he was
selling UC2 was supposed to go "up north," but he had removed

23

the three pounds for UC2 to purchase. UC2 asked if he could obtain a sample of the "coke" (cocaine) from NAVARRO LOPEZ since UC2 may have a buyer for it. NAVARRO LOPEZ stated he could get UC2 a sample now since he is about to "get rid of a block" (sell a kilogram) right now. NAVARRO LOPEZ further stated that he would "cut one up and shoot" (remove a sample) and give it to UC2. UC2 Stated he would come by at a later date and time to get the sample of cocaine from NAVARRO LOPEZ.

f.   UC2 told NAVARRO LOPEZ that it will take some time for UC2 to build back up his buyers of methamphetamine since he had lost his last "plug" (supplier), but that UC2 would be coming to him "on the regular" (steady) to purchase more methamphetamine and he would need to be patient. UC2 then removed the U.S. government funds from his left front pants pocket and asked NAVARRO LOPEZ if the price for the methamphetamine was the "same". NAVARRO LOPEZ replied, "Always." UC2 counted out the $3,600.00 in U.S. government funds and handed it NAVARRO LOPEZ. UC2 asked NAVARRO LOPEZ if UC2 starts purchasing larger quantities of methamphetamine, would NAVARRO LOPEZ lower the price. NAVARRO LOPEZ stated that he would. NAVARRO LOPEZ then recounted the U.S. government funds.

g.   NAVARRO LOPEZ told UC2 that the quality of the methamphetamine he was purchasing today was better than the last time. NAVARRO LOPEZ stated that the quality must be good for his buyers, "up north" in Chicago and that they transport and sell black and white heroin to Chicago as well. UC2 asked NAVARRO LOPEZ if he has a steady and safe transportation route to

Chicago. UC2 told NAVARRO LOPEZ that they may have buyers for
methamphetamine in Chicago and inquired what price would UC2
have to pay for methamphetamine shipped there. NAVARRO LOPEZ
stated that they are charging $2,500.00 per pound in Chicago and
$34,000.00 per kilogram of "Yayo" (cocaine). UC2 then told
NAVARRO LOPEZ that he would contact him later to obtain the
sample of cocaine from him.  The meeting ended and NAVARRO LOPEZ
exited UC2's vehicle and departed the area.

      h.   At approximately 7:33 pm, surveillance saw
NAVARRO LOPEZ leave the area in a red GMC pickup truck.[10]
NAVARRO LOPEZ was wearing the same red hat from the earlier drug
deal.

      i.   At approximately 7:50 pm, the surveillance team
continued to monitor NAVARRO LOPEZ's movements via the GPS
tracking of his phones.  Per the GPS data, NAVARRO LOPEZ
traveled from the meet location to the area of SUBJECT PREMISES
1.

      j.   Footage from the pole camera at SUBJECT PREMISES
1 shows that the red GMC arrived and parked at SUBJECT PREMISES
1.  NAVARRO LOPEZ parked the red GMC directly in front of
SUBJECT PREMISES 1.  HERNANDEZ then walked out from the area of
the residence of SUBJECT PREMISES 1 and up to the front
passenger door of the red GMC.  HERNANDEZ and NAVARRO LOPEZ
spoke briefly and then HERNANDEZ walked back toward SUBJECT
PREMISES 1.  During this walk, HERNANDEZ appeared to put

---

     [10]  The truck was a red 2008 GMC Sierra bearing California
license plate number 8N80799 and registered to Alexis R.
Gonzalez.

something into his left front pants pocket.  NAVARRO LOPEZ drove away in the red GMC.

   k.  Based on my training, experience and knowledge of this investigation I believe that HERNANDEZ placed UC currency that were the proceeds of the undercover methamphetamine transaction into his pocket and that HERNANDEZ was, in fact, the source of the methamphetamine.  I believe that after NAVARRO LOPEZ sold the methamphetamine to UC2, NAVARRO LOPEZ drove the red GMC directly to SUBJECT PREMISES 1 and gave the proceeds to HERNANDEZ.

   l.  I have also reviewed telephone toll data for both NAVARRO LOPEZ AND HERNANDEZ and saw that NAVARRO LOPEZ and HERNANDEZ contacted one another by text and phone call approximately nine times between July 9, 2021 and July 14, 2021, with six of the contacts occurring on July 14, 2021.

   m.  On August 1, 2021, The DEA Southwest Regional Lab tested the methamphetamine and found that it weighed 1,332 grams (approximately 2.9 pounds) and was 96% pure, yielding, 1,278 grams of actual methamphetamine.

   3.  Purchase of Six Pounds of Methamphetamine from
     NAVARRO LOPEZ on August 3, 2021

  31.  On or about August 3, 2021, LAFD DEA, VRO DEA, ATF, VCAT, and an ATF UC conducted a controlled purchase of approximately six pounds of suspected methamphetamine from NAVARRO LOPEZ.  Based on my involvement in the operation, my review of reports from the event, and my conversations with the involved personnel, I learned the following:

a.    On August 3, 2021, UC2 arranged via text messages and cellular phone calls to purchase approximately six pounds of methamphetamine from NAVARRO LOPEZ. The meeting and the transaction was planned to take place at the parking lot of the Carl's Jr.  NAVARRO LOPEZ had agreed that the price for the six pounds of methamphetamine would be $6,720.

b.    On the same date, UC2 met other ATF and DEA agents at a pre-determined meet location and was provided with U.S. government funds by the DEA and ATF.  The UC vehicle was also equipped with electric recording/monitoring devices.

c.    At approximately 6:34 pm, DEA SA Michael Johnson observed GPS data for one of NAVARRO LOPEZ'S phones was in the vicinity of Interstate 210 near Sylmar. Prior to this, GPS data indicated that NAVARRO LOPEZ's phone was in the vicinity of SUBJECT PREMISES 4 at Plummer and Sepulveda.

d.    At approximately 6:44 p.m., SA Albert Smith monitored the pole camera at SUBJECT PREMISES 1 and saw a dark 1993 Ford pickup truck bearing California license plate number 4U63417[11] arrive at SUBJECT PREMISES 1 and park in front.

e.    At approximately 6:46, SA Gertler monitored the pole camera and saw HERNANDEZ, who was dressed in all dark clothing and was carrying a medium sized light-colored weighted bag with two hands, walk from the area of residence at SUBJECT PREMISES 1 to NAVARRO LOPEZ.  HERNANDEZ handed the weighted bag through the driver side window to NAVARRO LOPEZ.  Moments later,

---

[11] This car was registered to Julio Cardona, 11141 Phillippi Ave., Pacoima, CA 91331.

still at the driver side window, HERNANDEZ took what appeared to be the same weighted bag back through the driver's side window. When HERNANDEZ received the bag back through the window, it appeared to be empty.  HERNANDEZ walked back to the area of the residence on SUBJECT PREMISES 1 with the non-weighted bag in hand.

f.   Shortly thereafter, at approximately 6:49 pm, SA Smith was in the area of SUBJECT PREMISES 1 an was monitoring the pole camera at SUBJECT PREMISES 1 and saw NAVARRO LOPEZ, wearing dark shorts, a black t-shirt, and a black baseball cap, exit the driver's seat of the Ford pickup truck and walk to residence on SUBJECT PREMISES 1.  At approximately 6:49 p.m., SA Johnson observed that GPS data for NAVARRO LOPEZ's phone was in the area of SUBJECT PREMISES 1 at the same time that SAs Gertler and Smith saw NAVARRO LOPEZ and HERNANDEZ.

g.   At approximately 7:12 pm, NAVARRO LOPEZ got into the Ford pickup and left SUBJECT PREMISES 1.

h.   At approximately 7:24 pm UC2 arrived in his/her undercover vehicle at the Carl's Jr. and parked in the northwest corner of the parking lot and remained in the driver's seat.

i.   At approximately 7:25 pm, VCAT Det. Adam Garnier observed the same Ford pickup truck driven by NAVARRO LOPEZ park in the parking lot of the auto repair shop at SUBJECT PREMISES 4.  Shortly thereafter, DEA SA Justin Botzet, monitored a pole camera that faced SUBJECT PREMISES 4 and the Carls Jr and saw NAVARRO LOPEZ walk into SUBJECT PREMISES 4. Shortly thereafter, DEA SA Botzet saw NAVARRO LOPEZ exit SUBJECT PREMISES 4 wearing

a black shoulder bag and walk across the SUBJECT PREMISES 4
parking lot towards the north end of the Carl Jr's parking lot.
Det. Garnier then observed NAVARRO LOPEZ arrive at the UC's
vehicle and enter the passenger seat.

      j.   At approximately 7:26 pm, UC2 was preparing to
text message NAVARRO LOPEZ to tell him he had arrived at the
meet location when he saw NAVARRO LOPEZ arrive in a black Ford
Truck.  UC2 saw NAVARRO LOPEZ drive the vehicle into the parking
lot of SUBJECT PREMISES 4 just west of the Carl's Jr. and then
out of the view of the UC.

      k.   At approximately 7:29 PM, UC2 observed NAVARRO
LOPEZ arrive on the passenger side of UC2'S vehicle with a black
nylon bag strapped over his neck. NAVARRO LOPEZ got into the
front passenger seat and greeted UC2.

      l.   NAVARRO LOPEZ removed the black nylon bag from
around his neck and opened the bag.  UC2 observed six packages
wrapped in tan colored tape inside the bag.  NAVARRO LOPEZ
counted out the six packages of suspected methamphetamine and
placed them in a green cloth bag that had been inside UC2'S
vehicle and placed that bag in the rear seat area of the UC
vehicle.  UC2 commented the packages of suspected
methamphetamine were packaged in the "burrito" style and
inquired if the quality would be the same as the Methamphetamine
that had previously purchased from NAVARRO LOPEZ.  NAVARRO LOPEZ
replied it was "fire shit" (good quality).  NAVARRO LOPEZ then
showed a photo from his cellular phone of numerous packages of
suspected methamphetamine laid out on the floor of some

location.  UC2 noted that the packages in the photo were the same as the ones had just received from NAVARRO LOPEZ.  UC2 asked NAVARRO LOPEZ how many packages were in the photo, and he replied, "180" (one hundred and eighty).

m.    At approximately 7:34 pm, SA Johnson observed that the GPS locator data for NAVARRO LOPEZ's phone was in the area of the Carl's Jr. at this time.  At approximately 7:45 pm, VCAT Det. Garnier observed NAVARRO LOPEZ exit UC2's vehicle and walk back to SUBJECT PREMISES 4 with the black shoulder bag. UC2 returned to a predetermined location. UC2 turned over the remaining $500.00 in unspent ATF Agent Cashier Funds. The Audio/Video recordings were also transferred to ATF SA Holden. SA Holden retrieved the suspected methamphetamine from UC2 and turned custody over to DEA SA Johnson.

n.    Shortly thereafter, DEA SA Botzet, monitored the pole camera in the area of SUBJECT PREMISES 4 and observed NAVARRO LOPEZ walk towards Plummer St. from SUBJECT PREMISES 4, cross the street, and then enter the driver's seat of a blue Jeep Cherokee bearing California license plate 6PJR958.[12]

o.    At approximately 7:53 p.m., surveillance units observed NAVARRO LOPEZ pull into the driveway of the residence located at 10001 Noble Ave., Mission Hills, CA 91305.  Shortly thereafter, surveillance units observed an older Hispanic male, wearing a black baseball cap, a grey t-shirt, and black shorts walk from the residence to the driver's side of the Jeep

---

[12] This Jeep was registered to Azairi M. Gonzalez or Juan Carlos Gonzalez.

Cherokee and engage NAVARRO LOPEZ in conversation. At approximately 7:58 p.m., surveillance units observed NAVARRO LOPEZ depart 10001 Noble Ave. and head north on Sepulveda Blvd. Shortly thereafter, NAVARRO LOPEZ was observed driving east on California State Route 118.  Shortly thereafter, NAVARRO LOPEZ was observed heading west on Interstate 210.  Shortly thereafter, NAVARRO LOPEZ was observed exiting onto Hubbard St. in Sylmar. Shortly thereafter, SA Smith observed NAVARRO LOPEZ arrive at SUBJECT PREMISES 1.  At this time, SA Johnson saw that the GPS data for NAVARRO LOPEZ's phone was in the area of SUBJECT PREMISES 1.

p.   Based on my training, experience and knowledge of this investigation, I believe that NAVARRO LOPEZ returned to SUBJECT PREMISES 1 to give HERNANDEZ the proceeds derived from the six pound methamphetamine deal between NAVARRO LOPEZ and UC2.

q.   The DEA Southwest Laboratory tested the methamphetamine and found that it weighed 2,695 grams (approximately 5.9 pounds) and was 96% pure, yielding 2587 g of actual methamphetamine.

4.   <u>Purchase of 5 Pounds Methamphetamine from NAVARRO LOPEZ on August 25, 2021</u>

32.  On August 25, 2021, agents conducted an undercover operation to purchase methamphetamine and firearms from NAVARRO LOPEZ.  Based on my review of reports from the event and my conversations with involved personnel, I learned the following:

a.   On August 25, 2021, UC2 arranged via text messages and cellular phone calls to purchase five pounds of methamphetamine and four firearms from NAVARRO LOPEZ. The meeting and transaction was planned to take place at a lot directly behind NAVARRO LOPEZ's place of business, the previously discussed auto repair shop on Plummer Street, that is, SUBJECT PREMISES 4.  NAVARRO LOPEZ had agreed that the price for the firearms would be $1,400 each and the price for the five pounds of methamphetamine was not set.  On the same date, UC2 met with other ATF/DEA agents at a pre-determined meet location and was provided with U.S. government funds by the DEA and ATF. UC2 and the UC vehicle were also fitted with electronic recording/monitoring devices.

b.   At approximately 8:07 pm, UC2 arrived in an undercover vehicle at the Carl's Jr.

c.   UC2 parked the UC vehicle in the south/west corner of the parking lot and called NAVARRO LOPEZ.  NAVARRO LOPEZ told UC2 to come inside SUBJECT PREMISES 4 through the only open garage door.  UC2 then contacted the ATF cover team and advised them he was going into NAVARRO LOPEZ's place of business for the meeting/transaction. UC2 then pulled the UC vehicle into the parking lot of 15421 Plummer Street and parked right in front of the open garage door. UC2 exited the UC vehicle and saw NAVARRO LOPEZ exit the business through the open garage door. NAVARRO LOPEZ was wearing a white t-shirt and shorts with a black nylon pouch draped over his neck.

d.    UC2 greeted NAVARRO LOPEZ and asked if the whole garage structure was his place of business. NAVARRO LOPEZ stated it was and that they conduct different types of automotive repair at the business. UC2 and NAVARRO LOEPZ then entered the business through the open garage door and UC2 observed two vehicles inside that were in different stages of auto body repair.  UC2 and NAVARRO LOPEZ then entered a room just south of the garage area.  NAVARRO LOPEZ showed UC2 an older model vehicle within the room that he stated he was in the process of restoring.  UC2 observed a black nylon bag that was inside the rear area of the vehicle that contained rifles.

e.    As UC2 and NAVARRO LOPEZ walked back into the garage area, UC2 asked if NAVARRO LOPEZ will be able to supply at least forty-five pounds of methamphetamine on the next purchase. UC2 then stated that the five pounds of methamphetamine he was purchasing now was going to another buyer so the next purchase may increase to fifty-five pounds.  NAVARRO LOPEZ stated that would not be a problem and that his manufacturers of methamphetamine were "cooking" (manufacturing) right now.  UC2 then observed NAVARRO LOPEZ use his cell phone to "face time" an unknown individual and had a conversation in Spanish.  UC2 asked NAVARRO LOPEZ how much his manufacturers of methamphetamine "cook" at one time. NAVARRO LOPEZ replied that they manufacture twenty to twenty-five pounds every day. NAVARRO LOPEZ further stated that they keep eight hundred to nine hundred pounds in storage.  NAVARRO LOPEZ then showed UC2 a photograph that he had on his cellular phone of numerous

packages of methamphetamine (the same type of packaging that UC2
had previously purchased from NAVARRO LOPEZ) and stated it was
eight hundred pounds that was being shipped "up north" (Chicago
area).  NAVARRO LOPEZ stated they used multiple vehicles to
transport the methamphetamine and that it was a total of "six
cars" that was being used.  UC2 told NAVARRO LOPEZ that his
previous supplier of methamphetamine would sometimes have issues
(problems) getting shipments of methamphetamine across the
border (from Mexico to the US).  NAVARRO LOPEZ said that was not
a problem for him since he used "multiple lanes" to cross his
methamphetamine into the United States.

      f.    UC2 again confirmed with NAVARRO LOPEZ that he
would be able to supply the larger purchase of methamphetamine
for the week of September 13th.  UC2 then asked NAVARRO LOPEZ if
he had the "straps" (firearms) for UC2 to purchase.  NAVARRO
LOPEZ and UC2 then walked back into the side room with the older
model vehicle.  NAVARRO LOPEZ went to the rear of the vehicle
and showed UC2 the black nylon bag that contained the firearms
that UC2 had observed.  NAVARRO LOPEZ told UC2 that the supplier
of the "ghost guns" (privately made firearms with no serial
numbers) had gotten off work late so was unable to bring the
firearms to him. NAVARRO LOPEZ then showed UC2 three firearms
that were inside the black nylon bag, including a pistol of
unknown manufacture and model with no serial number, a rifle of
unknown manufacturer and model with no serial number, and one
Springfield Armory model Saint rifle with serial number ST128860
and which had multiple rounds of ammunition and magazines.

NAVARRO LOPEZ stated that the firearms were his personal firearms and that the "Draco" (the Springfield Armory rifle) was semi-automatic but that he could supply full auto "Draco" firearms for $2,600.00 each.  UC2 asked NAVARRO LOPEZ what types of firearms he kept inside SUBJECT PREMISES 4. NAVARRO LOPEZ stated that he had an "AR," a 9mm pistol, and a .45 caliber pistol hidden within the business.  UC2 then attempted to purchase the firearms NAVARRO LOPEZ kept at his business, but NAVARRO LOPEZ declined to sell them.  UC2 agreed to just purchase the three firearms that NAVARRO LOPEZ had in the black nylon bag.  NAVARRO LOPEZ stated that he had four "ghost guns" being delivered to him later that night.  UC2 told NAVARRO LOPEZ that once NAVARRO obtained the firearms, he could bring them to UC2 at an (undercover) warehouse the following day.  UC2 stated that he would be unavailable to make the purchase but would arrange for someone at the warehouse to purchase them from NAVARRO LOPEZ.

g.   NAVARRO LOPEZ then took the black nylon bag containing the firearms out of the older model vehicle and carried them into the garage area and laid the bag on the floor. UC2 and NAVARRO LOPEZ then agreed on a price of $1,400 for each of the two unknown firearms and $1,600 for the "Draco" (Springfield Armory rifle) for a total price of $4,400.  NAVARRO LOPEZ then walked over to one of the vehicles inside the garage and retrieved a cardboard box and set it down next to the black nylon bag containing the firearms.  UC2 then observed NAVARRO LOPEZ retrieve five packages of suspected methamphetamine from

35

the cardboard box.  UC2 noticed that the packages of suspected methamphetamine were the same "burrito" style that UC2 had previously purchased from NAVARRO LOPEZ on August 3.

       h.   NAVARRO LOPEZ then placed the five packages of suspected methamphetamine inside the black nylon bag with the firearms.

       i.   UC2 and NAVARRO LOPEZ then agreed on a price of $1,100 per pound for the five pounds of suspected methamphetamine for a total price of $5,500.  NAVARRO LOPEZ told UC2 that he had just sold two .50 caliber rifles and that he still had the boxes in the back of his truck.  UC2 then removed U.S. government funds from his left front pants pocket and counted out the $4,400 in U.S. government funds and handed it to NAVARRO LOPEZ for the firearms.  NAVARRO LOPEZ then recounted the U.S. government funds.  UC2 then removed more U.S. government funds from his right front pants pocket and counted out the $5,500 in U.S. government funds and handed it to NAVARRO LOPEZ for the suspected methamphetamine.  NAVARRO LOPEZ then recounted the U.S. government funds.

       j.   UC2 and NAVARRO LOPEZ then discussed the sale of the four "ghost guns" that NAVARRO LOPEZ would be receiving later that night.  UC2 stated that he would be unavailable the following day.  UC2 then asked if NAVARRO LOPEZ was comfortable with bringing the firearms to the (undercover) warehouse the following day and conducting the sale with another person (another UC agent).  NAVARRO LOPEZ stated he was okay with that

arrangement but to have this person give a "code" word to NAVARRO LOPEZ that would be only known to the two of them.

k.   UC2 then took possession of the black nylon bag containing the three firearms and five pounds of suspected methamphetamine. Both UC2 and NAVARRO LOPEZ exited the garage area of the business through the open garage door. UC2 then secured the black nylon bag containing the three firearms and five pounds of suspected methamphetamine in the trunk of the UC vehicle.  NAVARRO LOPEZ then opened the rear area of a newer model truck and showed UC2 two black hard plastic rifle cases. NAVARRO LOPEZ told UC2 that they were the cases that the .50 caliber rifles came in that he had just sold.  NAVARRO LOPEZ then proceeded to show UC2 the truck and stated that it was a 2018 truck that he had lifted and spend a large sum of money on for modifications.  NAVARRO LOPEZ further stated that they also outfit vehicles with hidden compartments and that he had one inside the truck that could hold sixty pounds of methamphetamine.  NAVARRO LOPEZ also pointed out a couple of other vehicles within the parking lot that he stated he had just purchased.  UC2 again confirmed that his next purchase would be for forty-five to fifty-five pounds of methamphetamine.

l.   The meeting ended and UC2 returned to the UC vehicle and departed the area.

m.   UC2 was then surveilled to a pre-designated location where SA Holden retrieved the purchased methamphetamine and firearms, the remaining U.S. government funds, and the recording/monitoring devices.

n.   The DEA Southwest Laboratory tested the methamphetamine and found that it weighed approximately 2237 grams (approximately 4.9 pounds) and was 95% pure, yielding approximately 2,125 grams of actual methamphetamine.

**D.   Additional Purchase of Firearms from NAVARRO LOPEZ**

33.   On September 14, 2021, ATF conducted controlled purchase of firearms from NAVARRO LOPEZ.   Based on my conversations with ATF Special Agent Timothy Holden, I know the following:

a.   UC2 communicated with NAVARRO LOPEZ and asked about purchasing firearms.   NAVAROO LOPEZ said that he had firearms for sale and they agreed to meet at an ATF undercover location.

b.   UC2 gave NAVARRO LOPEZ directions to the ATF undercover facility and on September 14, 2021, NAVARRO LOPEZ showed up at the undercover facility in tan Toyota Tacoma.   He took a dark suitcase, which had the firearms in it, out of the bed of the Tacoma and brought it inside the facility.

c.   Inside the facility, NAVARRO LOPEZ showed the following firearms to UC2: five Glock-type personally made firearms and two AR-type personally made firearms.

d.   UC2 gave $7,100 to NAVARRO LOPEZ for the firearms.

e.   UC2 and NAVARRO LOPEZ further coordinated a purchase of 55 pounds of methamphetamine for the following week.

f.   NAVARRO LOPEZ left the undercover location with the $7,100.

**E.    Further Investigation of the SUBJECT PREMISES**

34.    A data base check indicated that Monica Buenrostro is married to HERNANDEZ and is listed on the deed as an owner of SUBJECT PREMISES 1.  "Cruz Miguel H." is named as the quit claim deed seller per the data base check.  Based on my investigation, I believe that Miguel Cruz HENNANDEZ, his wife Monica Buenrostro and children all currently reside at SUBJECT PREMISES 1.

35.    A database check indicated that Juan and Rosa Gutierrez own the property located at SUBJECT PREMISES 2. Based on my investigation, I believe that this property is being used as a methamphetamine conversion lab, but it is unclear if the property owners are involved in drug trafficking activities.

36.    A database check indicated that Francisco Rodriguez and Maria E Ruiz own the parcel of land where SUBJECT PREMISES 3 is located. The database inquiries indicated that Francisco Rodriguez and Maria E Ruiz have owned the property through at least 2012. Based on my investigation, I believe that this property is being used as a methamphetamine conversion lab, but it is unclear if the property owners are involved in drug trafficking activities.

37.    SUBJECT PREMISES 4 has one main office followed by the garage bay doors, with the employees of the different businesses entering and exiting the same main office door.  The businesses located at SUBJECT PREMISES 4 appear to all be connected with no separating walls.  During the deals with UC2, NAVARRO LOPEZ stated to the UC that the entire garage is his.  During the deals NAVARRO LOPEZ was observed entering and exiting the main

office door and has also been seen entering and exiting different garage bays.  It appears that SUBJECT PREMISES 4 contains businesses including Goninez Tires, 2nd Chance Kustomz, Pistons Auto, Jay Collision, and Smog Check. Dino and Rhonda Andrade own Smog Check and 2nd Chance Kustomz. Pistons Auto is owned by Juan Jose Funes, and Goninez Tires is owned by Bonieciado Godinez. From this investigation, it is believed that these businesses are involved with NAVARRO LOPEZ in his drug and firearm trafficking activities.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

38.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on

their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate

on a cash basis.  Such currency is often stored in their
residences and vehicles.

       g.  Drug traffickers often keep drugs in places where
they have ready access and control, such as at their residence
or in safes.  They also often keep other items related to their
drug trafficking activities at their residence, such as digital
scales, packaging materials, and proceeds of drug trafficking.
These items are often small enough to be easily hidden and thus
may be kept at a drug trafficker's residence even if the drug
trafficker lives with others who may be unaware of his criminal
activity.

       h.  It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

### VI.  <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

39.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

       a.  Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in

places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these

43

photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[13]

40.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

_____

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

42.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

46

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

43.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERNANDEZ'S and NAVARRO LOPEZ'S thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HERNANDEZ'S or NAVARRO LOPEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina- recognition feature.

44.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

47

## VIII.     **CONCLUSION**

45.   For all of the reasons described above, there is probable cause to believe that HERNANDEZ and NAVARRO LOPEZ committed a violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(a)(viii) Conspiracy to Distribute at least Fifty Grams of Methamphetamine.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachments A-1 to A-6.


_____
                                  /s/
ALBERT SMITH, Special Agent
Drug Enforcement Administration


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 20th day of
Sept., 2021.

_____
THE HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE